GUY OTTO, APPELLANT, V. L. L. CORYELL & SON ET AL.,
APPELLEES.

3 N. W. (2d) 915

FILED MAY 22, 1942.   No. 31330.

*C. L. Clark* and *Webb Rice*, for appellant.

*R. B. Travis, Tunison & Joyner* and *Frank M. Johnson*, contra.

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

PAINE, J.

This is an equity action, brought to reform or cancel a written instrument, and for an accounting. After trial in the district court, a decree was entered, finding that the plaintiff was not entitled to the relief asked for in his petition, and the action was therefore dismissed, from which the plaintiff appealed.

The amended petition with the exhibits attached makes up 40 pages of the transcript, and is too long to be set out at length in this opinion. It is charged therein that the attorney for L. L. Coryell & Son drafted a written instrument which purported to evidence an oral agreement between the plaintiff and Coryell's attorney two days before, but that the writing failed to state the actual agreement of the parties; that such failure resulted either from the mutual mistake of the parties, or mistake on the part of the plaintiff and deceit and inequitable conduct on the part of said defendant's attorney.

The facts stated as ground for cancelation are that plaintiff did not understand that the writing would deprive him of all control over his property for a period of eight years from and after June 15, 1940, for a rental of only $35 a month, or that in signing it he was unconditionally surrendering the property to Coryell for that term, or for that rental for any term, but did understand it to entitle him to a rental of ¾ cent a gallon on all gasoline sold at the station and other rentals, the total of which was in excess of $70 a month for a term of one year, and for such additional time as the parties should thereafter agree upon; and that such was the substance of the oral agreement which the writing was intended to evidence.

The prayer of this amended petition asked that the instrument be corrected and reformed to make the rent reserved ¾ cent a gallon, as understood by the plaintiff, and to cancel the pretended lease from Coryell & Son to Chandler and Pierce, who had leased the Lexington station from plaintiff, and that the parties be required to execute a new lease in keeping with the agreement of the parties, and that Coryell & Son be required to account to the plaintiff for all moneys received by it under the lease, and that all the defendants be restrained and enjoined from interfering with plaintiff's possession of the two north rooms of the Lexington filling station, and for such other relief as is just and equitable, including the cancelation of said writing in its entirety, and the restoration of the respective parties to the respective

positions which they occupied prior to the leases signed in June, 1939.

It is admitted in the answer that L. L. Coryell & Son is a copartnership, with its principal place of business in Lincoln; that the defendants Sam Chandler and Roy Pierce are residents of Dawson county, Nebraska, doing business in the city of Lexington under the name of the S & R Service Station.

It is further admitted by the defendants that on July 22, 1939, the plaintiff and defendants executed a certain written agreement, and that the plaintiff is the owner of lots 7 and 8, block 31, MacColl & Leflang's second addition to Lexington, and of the filling station and equipment located thereon.

Defendants admit the execution of the Exclusive Coryell Franchise and Form No. 4 ten-year lease, exhibit A, and also No. 5 lease, exhibit B; admit that the plaintiff operated the station in Lexington until June 15, 1939; admit that Coryells have leased the premises to Chandler and Pierce, who are operating the filling station thereon under a distributor's agreement executed by Coryells to Chandler and Pierce, but deny the other allegations in the amended petition.

The evidence in the bill of exceptions discloses that the plaintiff was about 45 years of age, and had lived in Plainview, Nebraska, for 31 years, and at the time of the trial was engaged in farming; that in addition to farming he had been in the gasoline business, having run a truck for the Farmers Union Cooperative Association in Plainview, and later built a station there, which he ran for a couple of years, and then for three or four years was in a filling station in Plainview under a contract with the Coryell company; that at Plainview the plaintiff had purchased a station and entered into substantially the same kind of contract with Coryell as is involved at the Lexington station; that the plaintiff owned the station, leased it to Coryell, and this corporation leased it back to him; that about the year 1936 plaintiff sold the station in Plainview at a profit, and asked Coryell's field man where he could get another station, preferring to get one on the Union Pacific line, that is, on highway No. 30, and the

field man suggested that a station at Lexington was for sale, and the plaintiff went down and bought the station and at once entered into a lease with Coryell for a ten-year period, leasing the property which he had just purchased, and taking back a lease from them.

Paragraph 4 of the lease, marked exhibit No. 3, reads as follows: "For the use of said premises Coryell undertakes and agrees to pay, during the term of this lease, to the landlord at Lexington, Nebraska, the sum of $35 per month, payable monthly in advance between the first and tenth day of each month, except that it is specifically agreed that in lieu thereof Coryell shall pay to the landlord the sum of $1 per year in advance during such time or times as the landlord shall be in possession of said premises under any sublease made as of even date or hereafter by Coryell to the landlord." This paragraph just quoted is an important element of the controversy between the parties in this case.

The lease on the Lexington property between the plaintiff and Coryell provided that the plaintiff would sell Coryell products exclusively.

On June 15, 1939, plaintiff sublet the station at Lexington to Chandler and Pierce for a term of one year, reserving one-half of the building, which plaintiff rented out for $15. The rental for the year of this lease was to be ¾ cent a gallon on all gasoline sold by Chandler and Pierce, and in addition the $15 a month rent from a cafe proprietor. Soon after Chandler and Pierce took charge of the station they began the sale of Hudson gasoline, which was an active and vigorous competitor of Coryell gasoline, both of these companies being known as "cut-rate" companies, as distinguished from the major gasoline companies.

On July 17, 1939, Coryell's attorney, Richard B. Travis, drove to Grand Island and talked to the plaintiff, who was working as a harvest hand near Grand Island, but came in town, and Travis and the plaintiff talked the matter over, sitting in the plaintiff's car in front of the Stratton hotel, and Travis testified that it was agreed that he would go to Lexington and get Chandler and Pierce to make a new con-

tract, binding themselves to sell Coryell gasoline exclusively, which was not a provision in the plaintiff's one-year lease with them. Travis testified that he told plaintiff that he would have to go to Lexington and find out the situation and protect Coryell's interest.

Arriving at Lexington, Mr. Travis went with Frank Johnson, a local attorney, to see Chandler and Pierce, and discussed the whole matter, including their displaying Hudson signs and taking down Coryell signs, and thus pushing the sale of a competitor's gasoline, which was a violation of Coryell's exclusive franchise contract with the plaintiff, which contract was then shown to Chandler and Pierce by Travis.

Chandler and Pierce stated that they had no knowledge of the existence of the exclusive contract, and no mention thereof had been made in their lease with plaintiff, and they thought they had a perfect right to sell any merchandise they wished at the station, and after a full discussion a new contract was entered into, which provided that Chandler and Pierce should continue to pay the plaintiff ¾ cent a gallon rental, just the same as he was receiving under their contract with him for one year, and the agreement was that there would be a new contract, No. 4 lease, from plaintiff to Coryell, and the Coryell company would in turn sublease the station to Chandler and Pierce, with a franchise agreement for the period of one year, at the rate of ¾ cent a gallon to be paid to plaintiff, and thereafter the rent to be paid to plaintiff was to be $35 a month, according to the original lease between Coryell and plaintiff. Travis then drove back to Grand Island, telephoned to plaintiff, who came into town from the farm where he was working, and they went over the whole matter, and Mr. Travis gave him a full statement of the new arrangement which had been made with Chandler and Pierce, and explained that the next day in Lincoln they would draw up the necessary papers to carry out this understanding, and would mail all of them to Jack Smith, manager of the Coryell gasoline station in Grand Island, and that plaintiff could come in and read all the papers, and if

they were satisfactory he could sign them in the presence of a notary public, and Mr. Smith would forward them to attorney Johnson at Lexington to submit to Chandler and Pierce for their signature.

This was all completed in a day or so in accordance therewith, and the plaintiff came in town to the filling station, read over and signed the papers, and under the new contract he continued to and did receive until the end of the period ¾ cent rental for his property at Lexington. The rental for the period ran from as low as $38.51 in January, 1940, to a high of $79.98 in October, 1939, and varied each month.

On June 7, 1940, Coryell & Son notified plaintiff that the period for which the rental of ¾ cent a gallon under the lease was to expire on July 15, after which he would receive the $35 a month, as stipulated in the contract, the same to be paid direct from the office of Coryell & Son in Lincoln, Nebraska. Plaintiff insists that this is the first time that he knew that for the balance of the eight years of the 10-year lease he would only receive $35 a month for his station, and he at once went to Lincoln and was told that Coryell & Son relied upon the instrument which he had signed. He then went to Lexington and insisted that Chandler and Pierce continue to make the payments of ¾ cent a gallon or surrender possession of the station to him, which they refused to do, and this lawsuit resulted.

The plaintiff's evidence is entirely different than that of Mr. Travis on their conversations. The plaintiff testifies on direct examination that Travis agreed to go to Lexington and make a new contract with Chandler and Pierce so it would show they must sell the Coryell products; that Travis asked him if, after his year was up, he would not take just $35 a month rent, and plaintiff said no, because it would not pay 6 per cent. on the principal and taxes and upkeep, but that the ¾ cent on a gallon would amount to more than the required payments, and, in addition, plaintiff mentioned he was also getting $15 a month rent on the other half of the building. Plaintiff said he told Travis he did not ever expect to take over the station as long as he could get ¾ cent for each gallon of gas sold.

Plaintiff testifies that on July 22, 1939, between 8:30 and 9:00 p. m., Jack Smith handed him two copies of the new agreement, exhibit No. 7, and after he had read it he went before a notary public and signed and acknowledged it. He claims he did not take as much time to read it as he would have done if they had not been in a hurry to find a notary at that time of night.

On cross-examination by Mr. Tunison, the plaintiff admits he did not tell Chandler and Pierce about his contract providing for exclusive handling of Coryell products, but, the way they talked, plaintiff said his expectation was they would handle Coryell gas.

On cross-examination by Mr. Johnson, plaintiff was asked the question: "Q. And did you ever make any objection to Coryell and company that that lease which they had sent to you did not properly and correctly reflect your understanding of the terms? A. No. I thought it was just for one year, and at the end of that time it would be over."

Plaintiff testified that he subsequently received his copy of the agreement back from Lincoln, with a letter from Mr. Travis. "Q. At any rate, you received it,—you received that letter? A. Yes, sir. Q. And you read it over again after you got it back, I take it? A. I don't know as I did. Q. You wouldn't say you didn't, would you? A. Well, I was down there working in the harvest fields, and I don't know as I did."

After trial of the case in the district court, a decree was entered, showing that all parties were present in court and represented by counsel, the evidence was taken, the cause argued and submitted to the court on May 27, 1941; that thereafter briefs were filed with the court, and on June 21, 1941, the court finds and adjudges generally for the defendants and against the plaintiff, and finds that the plaintiff is not entitled to the relief prayed in his petition, and therefore the cause of action of the plaintiff was dismissed by the district court.

In rendering this decision the district court said that its decision was based upon the case of *Beldeck v. National Fire*

*Ins. Co.*, 139 Neb. 171, 296 N. W. 873, the two syllabus paragraphs reading as follows:

"In an action for reformation of a written instrument, the burden rests upon the moving party of overcoming the strong presumption arising from the terms of the written instrument. If the proofs are doubtful and unsatisfactory and if there is a failure to overcome this presumption by testimony entirely plain and convincing beyond reasonable controversy, the writing will be held to express correctly the intention of the parties.

"Where the evidence, in an action for reformation of a written instrument, is sharply and irreconcilably conflicting, it becomes necessary to apply the well-known rule of equity that the evidence must be clear, convincing and satisfactory, and, in consequence, deny a reformation."

An examination of the *Beideck* case shows that a Lincoln agency issued a three-year policy of fire insurance on household goods located in a residence in Lincoln, in the amount of $2,000; that the plaintiffs loaded a large portion of the household goods on a truck and moved them to a farm in Minnesota, which they had rented, and where they intended to reside. While en route to the Minnesota farm, and near Fairfax, Minnesota, the truck caught fire and the goods were completely destroyed. The policy, in the form it was issued, did not allow recovery for this fire. The district court for Lancaster county found that, by inadvertence, accident, mutual mistake, or fraud, the terms of the contract agreed upon were not fully set forth in the policy of insurance, as the plaintiffs claimed that they told the agent they were going to the beet fields of Wisconsin, and would be gone some months, and wanted the insurance to cover the household goods at the residence in Lincoln, or wherever the goods might be, and Susie Beideck said the agent told her that he could furnish such a policy, and upon the delivery thereof she paid the $14 premium for three years, and supposed that she had the protection demanded. The agent for the company testified that he never made any such statements, that such a policy was not available to the plaintiffs nor any one else, that

no such insurance was written, that no such terms were discussed by them relating to the policy, and the decision of the lower court was reversed, and Judge Yeager said that, in the light of the established rule of law, there was not sufficient evidence on the part of the plaintiff to warrant a reformation of the policy in question; that to warrant a reformation the proofs must not have been doubtful, but must be satisfactory; they must be of sufficient weight to overcome the presumption that the written instrument signed by both parties correctly expressed the intention of the parties.

In *Paine-Fishburn Granite Co. v. Reynoldson,* 115 Neb. 520, 213 N. W. 750, Judge Rose said that a mistake for which a written instrument will be reformed must be a mutual mistake, and that a mutual mistake is one common to both parties, each laboring under the same misconception; also, that the burden of proof is on the party interposing the plea.

In the case of *Home Fire Ins. Co. v. Wood,* 50 Neb. 381, 69 N. W. 941, it was said generally that the burden rests upon the plaintiff of overcoming the strong presumption arising from the terms of a written instrument, and that if there is failure to overcome beyond controversy, the writing will be held to express the intention of the parties.

"In order to secure a reformation of a written contract on the ground of mistake, the evidence must be clear, convincing and satisfactory that the contract as written was made by mistake and does not reflect the real contract and agreement of the parties." *Oft v. Dornacker,* 131 Neb. 644, 269 N. W. 418. See, also, *Slobodisky v. Phoenix Ins. Co.,* 52 Neb. 395, 72 N. W. 483; *Hallgren v. Becker,* 94 Neb. 415, 143 N. W. 467.

"The right to reformation of a written instrument must be established by clear, convincing and satisfactory evidence, sufficient to overcome the strong presumption arising from the terms of the instrument that it correctly expresses the intention of the parties." *Neary v. General American Life Ins. Co.,* 140 Neb. 756, 1 N. W. (2d) 908. See, also, *Sutherland State Bank v. Dial,* 103 Neb. 136, 170 N. W. 666.

In the case at bar, there is no attempt to show that there was a mutual mistake in these instruments, and the excuse given by the plaintiff—that he signed the instruments without carefully reading them—does not meet the requirements of the law that the evidence of a mistake or fraud be clear and convincing.

The evidence of the plaintiff is absolutely in conflict with the evidence of others on the points in litigation. There is no dispute that the plaintiff had full and complete opportunity to carefully examine, weigh and consider every feature of the instruments which he signed. They were sent to the manager of the Coryell filling station at Grand Island, who had no interest in the matter whatever. There is nothing to show that the plaintiff could not have taken all the time that he needed for a careful examination and understanding of the contract he was signing, and he undoubtedly could have taken it to an attorney if there was any part of it which he did not understand.

"In an action in equity, this court will take into consideration the fact that the trial court observed the witnesses and the manner in which they testified, and must have accepted one version, rather than the other, of disputed facts." *Neihart v. Ingraham,* 140 Neb. 818, 2 N. W. (2d) 28. See, also, *Hole v. Hamp,* 134 Neb. 259, 278 N. W. 480; *Robinson v. Williams,* 136 Neb. 253, 285 N. W. 574; *Greusel v. Payne,* 107 Neb. 84, 185 N. W. 336.

Under all the circumstances in this case, and because of the fact that the trial court had an advantage over this court in seeing the witnesses while they were upon the stand, in noticing how they met cross-examination, and in judging their credibility, that court reached the conclusion that, under the evidence and the law, a case had not been made requiring a reformation of the instrument, and from our examination of the record, and the arguments made to this court, and the briefs submitted, we have reached the conclusion that the judgment entered by the trial court should be affirmed.

AFFIRMED.