Howard A. SHRUM and Ralph Prather, Appellants (Defendants below),

v.

William ZELTWANGER, Jr., and Heinhold Hog Market, Inc., Appellees (Plaintiffs below).

No. 4665.

Supreme Court of Wyoming.

Feb. 9, 1977.

Tom C. Toner, Redle, Yonkee & Arney, Sheridan, signed the brief and appeared in oral argument on behalf of appellants.

Micheal K. Shoumaker, Badley & Shoumaker, Sheridan, signed the brief and appeared in oral argument on behalf of appellees.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

RAPER, Justice.

What is a "cow?" This appeal comes here as an ultimate result of a dispute between plaintiffs-appellees contract buyers and defendants-appellants contract sellers of 134 "cows," over the answer to that question. The trial judge granted summary judgment to the plaintiffs for return of $6,700.00 they paid as a deposit on purchase of the cows and by the same summary action denied defendants' counterclaim. We will hold that summary judgment was improvidently granted, reverse and remand for trial of genuine issues of fact.

While the parties fail to hone their arguments into definitive issues, there is only one question as we see it. Do the depositions in support of the motion before the district court really disclose no issue of material fact?

One significant fact is not in dispute. The parties entered into a written agreement as follows:

"Aug. 3, 1973

"LIVESTOCK BILL OF SALE AND CONTRACT

"This Certifies, that Howard Shrum of Sheridan has this day bargained and sold to Heinhold Cattle Mkt., 134 head of Cows to be delivered F.O.B. cars, on or before 17 day of Sept., 1973 at $450. per head or at $ --- per cwt., to be weighed on twelve hours overnight stand and hauled at ------ with ------ cut back. Received as part payment $6,700 balance of $53,600 to be paid on delivery. I hereby guarantee title thereto, viz:

| No Hd. | Description | Brands | Location of Brands | Price Per Head |
|--------|-------------|--------|--------------------|----------------|
| 134 | Hereford-Few BB Cows | ꝯ | RH | |

"All of above stock to be free from encumbrance, including taxes for year of delivery, and to pass federal and state inspection for interstate shipment. Health and brand certificates to be furnished purchaser, free of charge, on delivery. Above to be free of contagious disease and in merchantable condition.

"(Seal) /s/ Howard A. Shrum, Seller
"Witness /s/ Steve Harris
" /s/ Wm. Zeitwanger, Jr. Purchaser"

Steve Harris, shown as a witness on the document, was the agent-buyer for the plaintiffs as purchasers. He negotiated the contract and was the active participant for the plaintiffs. Defendant Shrum negotiated the sale for the defendants.

From depositions on file, other peripheral circumstances are apparent. Prior to and when time for delivery arrived, defendants' cattle were in two groups, 54 at Story, Wyoming, and 80 at Otter, Montana. About two weeks before the delivery date, Harris went to Story along with a prospective buyer from his principal to look at the animals. Harris, though requested, did not inspect the Story group at the time of signing the contract. Defendant Shrum claims that at the time of the pre-delivery visit Harris said they were better than he expected. Harris claims he saw no yearling heifers. The visit is not in dispute. At the date of delivery, however, at that site, there were six or seven that had not been bred.

Harris made no examination of the cattle at Otter at any time prior to the delivery date, though at the time the contract was signed, Shrum asked Harris to inspect them, as well as those at Story. Harris said he trusted Shrum and thought no inspection necessary. Of all the cattle, at both Story and Otter, Harris refused to accept 72, as being heifers, which he claimed were not "cows" under the contract.

Shrum, when testifying by deposition, claimed that at the time the contract was signed, he told Harris that he "had 134 heifers and some young cows on them"; "I told him they weren't cows, they were heifers and some young cows on them. And he said that took care of the female end of the bovine family. So, I trusted his word and left it go." Harris deposed that Shrum represented all were cows that had lost calves and he assumed he was buying bred cows.

Harris, in his deposition, further testified as follows:

"Well, it's always been my thought that a cow is a female bovine that's already had a calf. Normally they're not referred to as a cow until after they've weaned their first calf. Even at that time they were often referred to as first-calf heifers."

Harris offered to take what he considered to be cows under the contract but refused the others. Shrum refused, claiming all were cows under their agreement.

The trial judge entered an order granting summary judgment for plaintiffs for the recited reason that: "There was a mutual mistake in the formation of the contract and the Plaintiffs should be entitled to judgment as a matter of law." As we read the depositions and as outlined in the foregoing narration, the district judge apparently decided that since the plaintiffs assert they intended one thing and the defendants assert they intended another, there was mutual mistake. That is not mutual mistake.

As nearly as we can determine, through search of West's Wyoming Digest, this court has not undertaken to define the expression "mutual mistake," though it has recognized that a contract may be cancelled on that ground. *Goodson v. Smith*, 1952, 69 Wyo. 439, 243 P.2d 165, reh. den. 244 P.2d 805. Mutual mistake makes a contract voidable. *Kipp v. Agee*, Wyo.1969, 457 P.2d 673, reh. den. 458 P.2d 728. In this tribunal it has likewise been recognized that an instrument may be reformed on that ground. *Arndt v. Sheridan Congregation of Jehovah's Witnesses, Inc.*, Wyo.1967, 429 P.2d 326; *Russell v. Curran*, 1949, 66 Wyo. 173, 206 P.2d 1159.

■ "Mutual mistake" is a common utterance in the law of contracts, however, and has come to have a universal meaning. A mutual mistake is one which is reciprocal and common to both parties, each alike laboring under the same misconception in respect to the terms of the written instrument. *De Long v. Cobb*, 1959, 215 Ga. 500, 503, 111 S.E.2d 89, 92; *Silver v. Overhead Door Co.*, 1949, 311 Ky. 650, 225 S.W.2d 115; *Belknap v. Bank of Prospect*, 1935, 259 Ky. 385, 82 S.W.2d 504; *Otto v. L. L. Coryell & Son*, 1942, 141 Neb. 498, 3 N.W.2d 915; *Commercial Standard Insurance Co. v. White*, Tex.Civ.App.1967, 423 S.W.2d 427; *Anderson Brothers Corporation v. O'Meara*, 5 Cir. 1962, 306 F.2d 672; *B. L. Ivey Construction Company v. Pilot Fire and Casualty Company*, U.S.D.C., N.D.Ga.1968, 295 F.Supp. 840. More briefly stated, it means a situation where both parties share the same misconception. 13 Williston on Contracts, 3d Ed. (Jaeger) § 1550A, p. 168, and, in the same volume § 1543, p. 75, pulling its effect into play, it is said:

"'Where both parties assume the existence of a certain state of facts as the basis on which they enter a transaction, the transaction can be avoided by a party who is harmed, if the assumption is erroneous.'"

Some courts have worded their definitions in different ways and it is probably well to set out some of those because they are clarifying. If the intention of the parties is identical at the time of the transaction, and the written agreement does not

express that intention, then a mutual mistake has occurred. *Tenco, Inc. v. Manning*, 1962, 59 Wash.2d 479, 368 P.2d 372. Mutual mistake may be defined as error in reducing the concurring intention of the parties to writing. *Naisbitt v. Hodges*, 1957, 6 Utah 2d 116, 307 P.2d 620. A mutual mistake exists where there has been a meeting of the minds of the parties and an agreement actually entered into but the agreement does not in its written form express what was really intended by the parties. *Sierra Blanca Sales Company, Inc. v. Newco Industries, Inc.*, 1972, 84 N.M. 524, 505 P.2d 867, cert. den. 84 N.M. 512, 505 P.2d 855.

The New Mexico court has used the expression "meeting of the minds." We cite the case for an occasion to update and supersede use of that well-known old contract phrase with the modern expression "mutual assent." In order for there to be a binding contract, there must be mutual assent—a mutual manifestation to the same terms. Calamari & Perillo, Law of Contracts, HB, §§ 11 and 12, pp. 13–14. 13 Williston on Contracts, 3d Ed. (Jaeger), § 1536, p. 33, refers to "meeting of the minds" as a "quaintly archaic expression." When there is mutual mistake, then there can be no mutual assent.

■ Since there was no mutual mistake the trial judge stated an erroneous ground for granting summary judgment. There remains a genuine dispute as to the meaning of the contract term "cows." One says it means one thing, the other, another. It must be realized that all that is before the court is the subjective expressions of the plaintiffs' buyer agent and the defendants and those expressions are at opposite poles. One or the other may or may not represent what the parties really intended by their transaction. The intent of the parties can only be ascertained by an objective not subjective approach in contract situations. The subjective intent of the parties is ordinarily irrelevant. An objective test is applied. A party's intention will be held to be what a reasonable man in the position of the other party would conclude

his manifestations to mean. Calamari & Perillo, Law of Contracts, HB, § 12, p. 14; 13 Williston on Contracts, 3d Ed. (Jaeger), § 1536, p. 11.

■ The only way to shake out what the parties intended or did not intend is by the adversary process of a trial. There may have been mutual mistake but from what we have examined it seems unlikely, though we would not foreclose that conclusion. The cancellation of a written agreement is a drastic interference with the right of parties to contract. While we have authority to do so, in a proper case, a court should not compel a party to relinquish the fruits of an honestly-made contract and deprive him of its benefits in the absence of clear, convincing and well-founded evidence. The burden of proving mistake is upon the party asserting it. *Goodson v. Smith*, supra.

■ Another possibility exists and that is there was unilateral mistake but even in that case, a mistake by only one of the parties ordinarily does not offer ground for avoidance of the contract or relief unless the mistake or relief is known by the other and particularly if caused by the other. *Svalina v. Big Horn National Life Insurance Company*, Wyo.1970, 466 P.2d 1018.

■ Since we decide that there was no mutual mistake as a matter of law, we must now see whether the summary judgment can be sustained on other grounds. We look at a motion for summary judgment in the same light as the district judge and as though it was originally before us because we now have exactly the same materials as he did. *Hunter v. Farmers Insurance Group*, Wyo.1976, 554 P.2d 1239; *Knudson v. Hilzer*, Wyo.1976, 551 P.2d 680. Furthermore, when we examine into a motion for summary judgment, we must look at the record from a viewpoint most favorable to the party opposing the motion. *Bluejacket v. Carney*, Wyo.1976, 550 P.2d 494.

■ The whole case revolves around what the parties intended by the use of the

word "cows" in describing the subject matter of the contract. Taken by itself, it has any number of meanings: Webster's Third New International Dictionary, Unabridged: "Cow: 1 a; * * * the mature female of wild or domestic cattle of the genus *Bos* or of any of the various animals the male of which is called *bull* * * * b: a domestic bovine animal regardless of its sex or age (bring home the * * *s) * * *." Black's Law Dictionary, 4th Ed.1951: "Cow. Female of bovine genus of animals. Strictly, one that has calved. Often loosely used to include heifer, or young female that has not calved. [Citing cases.]" Ballantine's Law Dictionary With Pronunciations, 2d Ed., under the word "cow," the volume states: "See * * * heifer." "Heifer. A female calf of the bovine species, from the end of the first year until she has had a calf; a young cow. [Citing case.]" See also West's Words and Phrases, p. 516, under the word "cow." We can conclude that it has within the corral of this case, no plain and ordinary meaning. From the definitions, the positions of either plaintiffs or defendants could be supported. Since the term "cows" is not clear, there must be a trial.[1]

■■■■ There are material questions of fact requiring resolution. Summary judgment should only be granted when there are no issues of material fact. Rules 56(c) and (d), W.R.C.P. The burden is on the moving party to clearly demonstrate that there is no genuine issue of material fact and if that is not done, the motion should be denied. *Greenough v. Prairie Dog Ranch,*

*Inc.,* Wyo.1975, 531 P.2d 499. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a course of action or defense asserted by the parties. *Johnson v. Soulis,* Wyo.1975, 542 P.2d 867.

The plaintiffs have failed to carry their burden.

Reversed and remanded for trial of the issues as we have noted and may otherwise appear.

---

1. The trial court and parties may find something useful in the following examples. Extrinsic evidence may be received to find the intent of parties as to the meaning of "timber" when not clear from the contract. *Walter v. Potlatch Forests, Inc.,* 1972, 94 Idaho 738, 497 P.2d 1039. Whether the word "chickens" in a contract for their sale means young broilers or old stewing hens throws the burden on plaintiff to show use of the word was in the narrow rather than broad sense. *Frigaliment Importing Co. v. B.N.S. International Sales Corp.,* U.S.D.C., S.D. N.Y.1960, 190 F.Supp. 116. *Frigaliment* and the problem of word interpretation in general, is discussed at length in "The Interpretation of

Words and the Parol Evidence Rule" by Professor Corbin, author of Corbin on Contracts in 50 Cornell Law Quarterly 161. The general theme of the work is that extrinsic evidence is a necessary aid in arriving at the intent of contracting parties. This court has held that the Uniform Commercial Code was intended to liberalize the parol evidence rule and limit the presumption that a written contract is a total integration and a court, following trial, can find under § 34–2–202(b), W.S.1957, Cum.Supp., that there are consistent additional terms unless it finds the agreement to be a complete and exclusive statement of its terms. *Zwierzycki v. Owens,* Wyo.1972, 499 P.2d 996.