**McCULLOCH GAS TRANSMISSION COMPANY, Appellant (Petitioner),**

v.

**The PUBLIC SERVICE COMMISSION OF WYOMING, Appellee (Respondent).**

No. 5390.

Supreme Court of Wyoming.

May 1, 1981.

Franklin D. Dodge, Los Angeles, Cal., specially admitted for purposes of this case, Richard J. Barrett and John B. Speight of Hathaway, Speight & Kunz, Cheyenne, signed the brief of appellant. Dodge and Barrett appeared in oral argument.

John D. Troughton, Atty. Gen., Thomas J. Carroll, III, Senior Asst. Atty. Gen., Nat. Resources Division, and Steven R. Shanahan, Asst. Atty. Gen., signed the brief of appellee. Steven R. Shanahan, Asst. Atty. Gen., appeared in oral argument.

Before ROSE, C. J., and McCLINTOCK *, RAPER, THOMAS and ROONEY, JJ.

* Retired March 26, 1981, but continued to participate in the decision of the court in this case pursuant to order of the court entered March 30, 1981.

RAPER, Justice.

This case arises from the Public Service Commission's (PSC) denial of McCulloch Gas Transmission Company's (Transmission) application to pass on to its customers costs incurred in the purchase of "the rights to purchase prospectively 1.13 billion cubic feet (Bcf) of natural gas for the benefit of McCulloch's [Transmission] present and future Wyoming consumers." Transmission challenges the findings of the PSC and the district court which heard the case on appeal as being arbitrary and capricious, an abuse of discretion, based upon the wrong standards for determining just and reasonable rates, and constituting an unconstitutional taking.

We will affirm.

▆ The facts in this case are extremely convoluted because of the existence of several subsidiaries of McCulloch Oil Corporation (McCulloch) which were prime participants in the underlying transaction involved here. In order to have any understanding of the case, the intricate relationships found between these organizations must be scrutinized.

First, we start with Transmission, the appellant in this matter. It is a wholly-owned subsidiary of McCulloch. It "was granted a Certificate of Public Convenience and Necessity to operate a natural gas pipeline in the Powder River Basin of Wyoming in 1963 by the Wyoming Public Service Commission." Through its pipelines, gas is transported and sold to individual customers as well as Northern Gas Company and Petrolane-Wyoming which corporations service Moorcroft, Newcastle, and Gillette.

Transmission purchases 80 percent of its gas from McCulloch Interstate Gas Corporation (Interstate), a subsidiary of McCulloch. Interstate in turn purchases the bulk of its natural gas supply in the Powder River Basin from McCulloch Gas Processing Corporation (Processing), still another McCulloch subsidiary. It is Processing's job to purchase the raw gas from the producers in the field throughout the Powder River Basin and then convert it to usable fuel at either its Oedekoven or Ute gas processing plant, after which the gas then goes to Interstate. Though Interstate delivers most of what is purchases to Transmission, a lesser amount is also sold to Colorado Interstate Gas Company for Interstate use. It also may be worth observing that H. C. Ouzts who testified in this matter before the PSC has been president of both Processing and Interstate as well as Transmission since 1972.

In order to unravel the dispute between Transmission and the PSC, we must start with June 1, 1969. On that date Pan American Petroleum Company and McCulloch entered into three contractual agreements. These were each named as follows: (1) Gas Sales and Purchase Contract; (2) Transportation Agreement; and (3) Gas Exchange Agreement. The purpose of the arrangement was to provide McCulloch with casing-head gas which it would process and sell. McCulloch would take title to the gas it received, but Pan American would reserve unto itself the dry residue gas which would separate out during processing. McCulloch was not required to physically store Pan American's gas; under the agreement, it was allowed to create a reserve account for Pan American from which that company could draw gas when desired. In effect this resulted in McCulloch storing Pan American's gas in a reserve account until such time as Pan American could utilize it. When actually used, Pan American would pay the average value of the processed gas minus 15.363 cents per Mcf, the value of the raw gas. Processing never paid Pan American or Amoco for any gas in the account.

Sometime after the execution of the contracts, Amoco Production Company (Amoco) succeeded Pan American, while Processing replaced McCulloch. Meanwhile, Transmission accepted and agreed to provide transportation for any gas which Amoco demanded of Processing.

On May 5, 1973, Amoco demanded that Processing begin supplying processed gas in

accord with the contract; it had begun a waterflooding project at one of its fields and had installed pumping equipment requiring natural gas as fuel. However, Transmission refused to deliver the gas, claiming that to do so would reduce its own gas supply and endanger its ability to meet its customers' demands. The contract as originally entered into was thus apparently one that was disadvantageous to Processing and particularly Transmission because of its customer commitments and a decreasing supply of gas. Processing notified Amoco that the gas would not be forthcoming, thereby electing to breach the contract. Negotiations between the parties failed to produce any settlement. Accordingly, Amoco filed suit against McCulloch, Processing, and Transmission on February 20, 1974, in the district court, Natrona County.

Over two years later with the case lying dormant on its doorstep, the district court announced that unless some action were taken, the complaint would be dismissed for want of prosecution. In response thereto on October 28, 1976, Amoco filed a motion to amend its complaint and raise the damages claimed from approximately 1.5 million dollars to 11.5 million dollars.

The case continued in limbo until September 1, 1978, when the parties reached an accord which was formalized into an agreement dated January 1, 1979. This agreement provided in part:

"THIS AGREEMENT is entered into effective as of the 1st day of January, 1979, by and between AMOCO PRODUCTION COMPANY, a Delaware corporation ('Amoco'), and McCULLOCH OIL CORPORATION, a Delaware corporation, McCULLOCH GAS PROCESSING CORPORATION, a Delaware corporation and McCULLOCH GAS TRANSMISSION COMPANY, a Wyoming corporation, (collectively 'McCulloch').

\* \* \* \* \* \*

"WHEREAS, it is the intention of this Agreement and the desire of the parties to compromise and settle, finally and conclusively as of the effective date hereof, all their differences and all causes of action involved in the lawsuit between the parties and arising out of the facts and claims set forth therein without, however, committing either party to the other party's interpretation of the Contract and/or Agreements.

"NOW, THEREFORE, the parties, for and in consideration of the covenants herein contained and the payments provided herein, the receipt and sufficiency of which are hereby acknowledged do agree as follows:

\* \* \* \* \* \*

"3. McCulloch shall upon execution of this Agreement, shall [sic] pay to Amoco the sum of Five Hundred and Eight-One [sic] Thousand Dollars ($581,000.00) as an agreed upon amount and settlement in full for all past and present gas volumes and the delivery of such volumes claimed due and owing by Amoco in the lawsuit as of the effective date hereof under the reserve account provided for in the Exchange Agreement, up to and including December 31, 1978. Without affecting the Final Settlement hereof, McCulloch represents and intends that the payment of such sum reflects the purchase of gas for the benefit of the Wyoming gas customers of McCulloch Gas Transmission Company. By payment of such sum McCulloch shall be and hereby is fully released from all claims that it failed to sell, compensate, exchange, transport, deliver and/or otherwise provide certain residue gas to Amoco under the said Contract and Agreements and Amoco agrees that its claims and demands with respect to the dispute relating thereto are fully satisfied, discharged and settled. Likewise, McCulloch collectively agrees and does hereby release Amoco from any and all claims, demands, liabilities or causes of action of whatsoever nature that it might allege to have arisen out of any such dispute as to said Contract and Agreements as of the effective date hereof.

"4. Neither party admits or denies for purposes of the lawsuit, or otherwise, the validity or invalidity of the claims or contentions of the other party in the lawsuit

including but not limited to whether or not McCulloch has an obligation under the aforereferenced Contract and Agreements to sell, compensate, exchange, transport, deliver and/or otherwise provide certain residue gas to Amoco."

On April 23, 1979, Transmission petitioned the PSC for authority to increase its rates in order to pass through to its Wyoming natural gas customers the $581,000 it paid Amoco pursuant to the settlement agreement. It was Transmission's claim that it had in effect purchased "the rights to approximately one billion cubic feet of natural gas held in a reserve account by an affiliate, McCulloch Gas Processing Corporation." The PSC, under § 37–3–106(c), W.S.1977,[1] suspended the requested increase in rates pending public notice and hearing by an order entered May 1, 1979.

A hearing was conducted on July 20, 1979. At that time, the PSC's staff opposed the reasonableness of the rate increase under § 37–3–101, W.S.1977:[2]

"All rates shall be just and reasonable, and all unjust and unreasonable rates are prohibited. No public utility shall directly or indirectly by any device whatsoever, or in anywise, charge, demand, collect or receive from any person a greater or less or different compensation for any service rendered or to be rendered by such public utility than is charged, demanded, collected or received by such public utility from any other person for a like and contemporaneous service under similar circumstances and conditions."

Section 37–3–106(a), W.S.1977, provides that:

"(a) At any hearing as provided in this act involving an increase in rates or charges sought by a public utility, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the utility."

Following the hearing, the PSC found that Transmission had failed to carry its burden of proof, as to the reasonableness of the pass on. Accordingly, on October 19, 1979, it denied the rate increase.

Transmission then sought review of the PSC's decision in the district court as authorized in § 9–4–114, W.S.1977, 1980 Cum. Supp.[3] It filed a petition for review on

---

**1.** Section 37–3–106(c), W.S.1977:

"(c) Whenever there is filed with the commission by any public utility any application or tariff proposing a new rate or rates, the commission may, either upon complaint or upon its own initiative, initiate an investigation, hearing, or both, concerning the lawfulness of such rate or rates. Pending its decision thereon, the commission may suspend such rate or rates, before they become effective but not for a longer initial period than six (6) months beyond the time when such rate or rates would otherwise go into effect. If the commission shall thereafter find that a longer time will be required, the commission may extend the period of suspension for an additional period or periods not exceeding in the aggregate, three (3) months."

**2.** Though not applicable to this case, we note that § 37–3–101 was amended effective 6/2/80. Such amendment in no way alters the law of this case.

**3.** Section 9–4–114, W.S.1977, 1980 Cum.Supp.:

"(a) Subject to the requirement that administrative remedies be exhausted and in the absence of any statutory or common-law provision precluding or limiting judicial review, any person aggrieved or adversely affected in fact by a final decision of an agency in a contested case, or by other agency action or inaction, or any person affected in fact by a rule adopted by an agency, is entitled to judicial review in the district court for the county in which such administrative action or inaction was taken, or in which any real property affected by such administrative action or inaction is located, or in the event no real property is involved, in the district court for the county in which the party aggrieved or adversely affected by the administrative action or inaction resides or has its principal place of business. The procedure to be followed in such proceeding before the district court shall be in accordance with rules heretofore or hereinafter adopted by the Wyoming supreme court.

\* \* \* \* \* \*

"(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

November 19, 1979. Following briefing and oral arguments, the district court entered an order affirming the PSC's holding on August 14, 1980. It is from the district court's ruling that this appeal arises pursuant to § 9–4–115, W.S.1977.[4]

Before us, appellant has first challenged the PSC's order as arbitrary and capricious, and as an abuse of discretion, and the district court's affirmance as clear error. However, we cannot agree. Under the law of this jurisdiction it was appellant's burden to show the PSC that the proposed increase in the rate it would charge its Wyoming customers was just and reasonable. The PSC concluded that appellant had failed to carry its burden. The district court found no error in the PSC's action. We concur with the district court's determination.

The undisputed evidence before the PSC was that Transmission had paid Amoco $581,000 in cash, though when cancelled debts were added in, the total reached $650,000. But under the law, that was not enough to entitle it to authority for a pass on; Transmission had the additional burden of establishing that the expenditure was a just and reasonable cost of purchasing gas.

Its sole witness characterized the transaction as follows:

"Transmission simply purchased 1.13 billion cubic foot of gas rights. That's the title to that much gas, the right to buy it. That's what they bought.

"They did not settle a lawsuit for damages with Amoco. They bought the reserve account. I don't think half of the settlement is necessarily the brunt, either. Two parties to the litigation, one of them walked away with a commodity, the Transmission Company with the right

to have that gas for their customers for $581,000. The balance of the $1,096,000 is the settlement."

As the witness also testified:

" * * * Under the reserve account procedures, Processing was to be paid the difference between the reserve gas account unit price of 15.363 cents per Mcf and the current average price of gas actually delivered to Amoco."

Thus, Amoco, when receiving the gas due it from Processing, would pay the current price of the gas minus 15.363 cents per Mcf. Spreading this over the entire 1.13 billion cubic feet due Amoco under the contract indicates that Amoco would save $234,000 over the current average price. Accordingly, if Transmission bought this reserve account, it paid Amoco a total of $650,000 for a price discount worth $234,000. There was no evidence presented to the PSC that anyone other than McCulloch or one of its subsidiaries which were being sued by Amoco thought this was a reasonable deal.

Another point concerns the settlement agreement. Transmission places a great deal of emphasis upon the language in it stating:

" * * * Without affecting the Final Settlement hereof, McCulloch represents and intends that the payment of such sum reflects the purchase of gas for the benefit of the Wyoming gas customers of McCulloch Gas Transmission Company. * * * "

But, later on the agreement also provided that:

"Neither party admits or denies for purposes of the lawsuit, or otherwise, the validity or invalidity of the claims or con-

---

"(i) Compel agency action unlawfully withheld or unreasonably delayed; and

"(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

"(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

"(B) Contrary to constitutional right, power, privilege or immunity;

"(C) In excess of statutory jurisdiction, authority or limitations, or lacking statutory right;

"(D) Without observance of procedure required by law; or

"(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute."

**4.** Section 9–4–115, W.S.1977:

"An aggrieved party may obtain a review of any final judgment of the district court under this act [§§ 9–4–101 to 9–4–115] by appeal to the supreme court. The appeal shall be taken as in other civil cases."

tentions of the other party in the lawsuit including but not limited to whether or not McCulloch has an obligation under the aforereferenced Contract and Agreements to sell, compensate, exchange, transport, deliver and/or otherwise provide certain residue gas to Amoco."

The agreement specifically disclaims that Amoco was entitled to any gas under the contract. The statement in the settlement agreement that it represents a gas purchase is self-serving. We examine the contract for what it actually is, not what a party states it is. The intent of the parties to a contract can only be ascertained by an objective not subjective approach. The subjective intent is irrelevant. An objective test is applied. *Shrum v. Zeltwanger*, Wyo. 1977, 559 P.2d 1384. The statement that the payment was the purchase of the reserve account was immaterial to Amoco and unnecessary to the settlement, neither adding to nor detracting therefrom. The real purpose was to settle a claim for breach of contract. There was no increase in cost of gas that can reasonably be considered as a pass-on.

In support of its findings, the PSC did have before it evidence clearly establishing that: (1) a contractual arrangement existed between Processing and Amoco; (2) a dispute arose between the parties to that contract whereby Amoco sued McCulloch, Processing, and Transmission for ultimately over $11,000,000; (3) at the time of the suit and continuing up through the hearings before the PSC, the president of Processing was also the president of Transmission; (4) after years of haggling, a settlement was reached whereby Amoco received over $1,000,000; (5) of the total settlement, Transmission paid $650,000 of which $581,000 was in cash; (6) the rights Transmission received in exchange were claimed by Amoco in its complaint in the civil suit to be worth $234,000 to it in the form of discounts on the price of gas it purchased from Processing; (7) however, in the settlement agreement McCulloch, Processing, and Transmission refused to recognize the valid-ity of Amoco's claim, which arguably would account for Transmission's failure to reduce the amount it sought to pass on ($581,000) by the amount it should have been saving in discounts ($234,000); (8) Transmission only sought to pass on the amount it paid Amoco in cash, while cancellation of debts was not included; and (9) a similar settlement favorable to Transmission in another case had been credited to retained earnings and had benefited the stockholders rather than the Wyoming customers.

The period covered by the settlement ran from May 5, 1973 to September 1, 1978, effective January 1, 1979. During that period Transmission had already sold the gas Pan American (Amoco) claimed a right to under its contract to Transmission customers, and it had been paid for by those customers at whatever rates prevailed at that time. The effect then, was that any of Transmission's customers served by that gas would be required to pay for it by reason of the breach settlement, at least in part, a second time in future rates. That also would not be just and reasonable.

As an appellate court considering an appeal from an administrative agency, we must accept the agency's findings of fact when supported by substantial evidence. *First Nat. Bank of Worland v. Financial Institutions Board*, Wyo.1980, 616 P.2d 787, 793–794. Substantial evidence is relevant evidence which a reasonable mind might accept as supporting the agency's conclusion. *Board of Trustees, Laramie Cty. Sch. Dist. No. 1 v. Spiegel*, Wyo.1976, 549 P.2d 1161, 1178. We hold there is more than sufficient substantial evidence to support the PSC's finding that this was not a just and reasonable cost of purchasing gas as required by § 37–3–101, W.S.1977. Therefore, we uphold the PSC against appellant Transmission's first two challenges.

 Transmission's final challenge to the PSC's order is that the commission used the wrong standard for determining what is a just and reasonable rate[5] or further its

---

5. The standards of the PSC are expressed in its Finding No. 19:

"19. It is the established policy of this Commission to allow the pass on of increased

order amounted to an unconstitutional taking. First what is just and reasonable is to be decided on a case-by-case basis. The public interest is to be given paramount consideration; desires of a utility are secondary. *Big Horn Rural Electric Co. v. Pacific Power & Light Co.*, Wyo.1964, 397 P.2d 455. The purpose of the PSC's authority is to protect the public from utilities affected with a public interest. 64 Am. Jur.2d § 230, p. 736; 73 C.J.S. § 32, p. 1054. Here, despite Transmission's own characterization, there was evidence that could reasonably be viewed as indicating that McCulloch and its subsidiaries saw a way of breaching a disadvantageous contract and passing half of the resulting liability off on the public.

Transmission has failed to carry its statutory burden, § 37–3–106(a), supra, of proving the increased rate as being just and reasonable. No authority has been presented by Transmission that settlement of a lawsuit for breach of contract is an item eligible for pass on to customers of a utility, particularly when by that settlement it denies any indebtedness. H. C. Ouzts testified that the contract had been deliberately breached.[6]

Transmission argues that "in the absence of a showing of inefficiency, *improvidence*, waste or bad faith on the part of management," (emphasis added) a regulatory agency cannot ignore fair and reasonable expenses of operation, citing *Petition of New England Tel. & Tel. Co.*, 1949, 115 Vt. 494, 66 A.2d 135, 147. There is no question but what the settlement arose out of Processing's breach of contract with Pan American and Amoco in refusing to deliver gas as agreed. We consider that deliberate failure

of Processing to deliver gas in accordance with its contractual obligation an act of improvidence in that damages could have been foreseen. "Improvidence" means lack of care and foresight. Webster and Black's Law Dictionary, Fifth Edition, 1979. Other cases cited by Transmission bear out the same conclusion with improvidence being an exception to allowance of expenses in rate fixing. *Alabama Public Service Commission v. Southern Bell Telephone and Telegraph Co.*, 1949, 253 Ala. 1, 42 So.2d 655, 674; *Wisconsin Telephone Co. v. Public Service Commission*, 1939, 232 Wis. 274, 287 N.W. 122, 149; *West Ohio Gas Co. v. Public Utilities Commission of Ohio*, 1935, 294 U.S. 63, 72, 55 S.Ct. 316, 321, 79 L.Ed. 761, 769.

As pointed out in Public Service Commission for the *State of New York v. Federal Power Commission*, D.C.Cir.1972, 467 F.2d 361, the primary mission of a regulatory body is to protect the consumer, it must "strive to reach a balance between consumer, producer, and those whose interests fall in between." The fixing of just and reasonable rates by the PSC involves a balancing of investor and consumer interests, but a fair return to investors is not necessarily fair to consumers. *Petition of New England Tel. & Tel. Co.*, supra, 66 A.2d at 147.

Accordingly, it was proper for the commission to conclude that the proposed rate increase was not just and reasonable. "Beyond that the judgment of the [PSC] is not reviewable by this court." *Cascade Natural Gas Corp. v. Davis*, 1977, 28 Or.App. 621, 560 P.2d 301. It is a basic concept in public utilities law that rate making is a legislative function delegated to the PSC. Conse-

---

wholesale costs incurred by utilities operating in Wyoming under certain, well known conditions. Those conditions are: a) the basis for the proposed pass-on is a valid wholesale commodity cost increase beyond the Commission's control; b) the utility's actual rate of return is reasonable and at or below the return authorized by the Commission and allowing the pass-on will not result in the utility earning greater than the authorized return; and c) the pass-on is applied in an equal or proportionate manner to all the utili-

ty's service classes with consideration given to the nature and level of the wholesale increase. McCulloch's application and the record of the hearing show that while McCulloch's application may meet the last two conditions, it does not meet the first."

6. Mr. Ouzts' testimony:
"Q. I understand it was your decision to [b]reach the contract in the first instance.
"A. It was my decision not to deliver gas and that breached the contract, yes."

quently the judiciary must refrain from any semblance of rate making. *Public Utilities Commission v. District Court In and For City and County of Denver*, 1974, 186 Colo. 278, 527 P.2d 233. We shall leave rate making where it belongs—with the PSC. As a result, we must uphold its action in this case.

As for Transmission's constitutional claim, the issue was not raised either before the agency or before the district court. Issues not raised before an administrative agency or even the district court on review will not be considered for the first time by us on appeal. *Matter of Rule Radiophone Service, Inc.*, Wyo.1980, 621 P.2d 241, 246–247; Rule 12.09, W.R.A.P. The PSC was acting within its jurisdiction and we find no taking of property in rate fixing. Therefore, we will not consider appellant's contention in that regard.

Affirmed.

ROONEY, Justice, concurring.

While I concur with the majority opinion, I believe the matter could have been handled more properly on a procedural basis without much reference to the merits of appellant's contentions.

It is obvious that the $581,000 expenditure upon which appellant premises its request for a rate increase does not meet the definition of a "pass on" or "pass through" item so as to trigger the automatic or expedited procedure used for rate increases in "pass on" or "pass through" circumstances. It was obvious from the inception of the case that the $581,000 expenditure was not pursuant to authorization of another regulatory agency but was to be considered as something other than an increase in the cost of the commodity subject to the jurisdiction of an agency other than appellee Public Service Commission (hereinafter referred to as PSC).

"Pass on" or "pass through" procedures have developed during the past several years because the cost to the utilities of the commodity supplied by them began to change so often pursuant to authorization, directly or indirectly, of federal regulatory agencies (thus without the jurisdiction of the PSC) that it became impractical to conduct a full rate hearing in each instance. The PSC used the automatic or expedited "pass on" or "pass through" procedures when conditions were such that only the cost of the commodity was involved, that it was subject to regulation of another agency, and that other rate factors were not involved. A full rate hearing takes considerable time and effort since the evidence must concern the gross revenues, operating expenses, rate base, rate of return, rate structure, etc., of the utility.

Section 249 of the present Rules of the PSC sets forth the conditions under which "pass on" or "pass through" procedures may be utilized:

"Section 249. *Wholesale Utility Commodity Purchase Pass-on Procedure.* Pursuant to W.S. 37–3–106 (1977) [1] as may be amended and the rate filing requirements of this Chapter, a utility may file an application to pass on to its utility customers in their rates, prospective cost increases in the utility's wholesale utility commodity; and the same will be authorized, subject to public notice, opportunity for hearing, and refund, if the evidence of record shows that:

"a. The pass-on is for wholesale utility commodity cost increases not under this Commission's jurisdiction;

"b. The pass-on will not increase the utility's rate-of-return, and its rate-of-return is at or below that last authorized by the Commission (if the rate-of-return is in excess of that authorized the pass-on amount will be reduced accordingly);

"c. The pass-on is applied on an equal or proportionate basis to all class rates and the rate steps therein (excluding minimum charges);

1. Section 37–3–106, W.S.1977 mandates notice from utilities to the PSC of rate changes, authorizes investigations and hearings by the PSC

relative thereto, and provides for suspensions and approval of such changes by the PSC.

"d. All pass-on charges are filed as a separate cumulative rate rider or surcharge which will be blended into base rates at appropriate intervals in general rate case proceedings or as otherwise ordered by the Commission; and

"e. There is provision for interest on overcollections to be made part of the refund. (Interest will include any interest received by the utility as ordered by the Federal Energy Regulatory Commission and, otherwise or in addition thereto, interest as determined by the Commission.)"

Inasmuch as the first condition for use of the "pass on" or "pass through" procedure was not present, the procedure could not be properly applied to appellant's request. The parties may have made reference to costs authorized by another regulatory agency during their computation in arriving at the $581,000 figure, but the amount allocated from the settlement figure to this purpose was entirely arbitrary.

The president of appellant testified that: "A. 58.1 cents per Mcf simply reflects the $581,000 purchase of Amoco's rights to that gas. *That is not based in the Natural Gas Policy Act of 1978.*

"Intrastate purchases directly from producers, the maximum price is set by the Natural Gas Policy Act of '78, as far as the actual sales price.

"The rights to gas are not in any way controlled. These were previously covered by various orders of the FPC allowing intrastate purchasers to purchase directly from producers for their own supply and make arrangement with Interstate companies for exchange and/of [sic] transportation of that gas. It is that type of purchase that was made here.

"*The 58.1 cents has nothing whatsoever to do with the pricing provisions of the Natural Gas Policy Act of 1978.* But if you add the appropriate provision of that or the section of that Act or the 35 cents

per million Btu to arrive at the 84.7, then you are reflecting the price for the gas under the Natural Gas Policy Act for that vintage plus the acquisition of that gas or the right to purchase it at that price rather than have Amoco or any other producer use that gas for their own benefit." (Emphasis added.)

The arbitrary nature of the $581,000 figure as it pertains to an increase in the cost of the gas is further evidenced by the three contracts, all dated June 1, 1969, which formed the basis of the lawsuit which was terminated by the settlement agreement. Appellant was not named as a party to any of them.[2] The named parties were McCulloch Oil Corporation and Pan American Petroleum Corporation. After the signatures of the parties on the Gas Exchange Agreement, the following appears: "Accepted and agreed to this 15th day of July, 1969. McCulloch Gas Transmission Company by Byron A. Williams, Vice President and General Manager." It was signed by Mr. Williams. The same language and signature, except that the date is June 29, 1970, appears after the signature of the parties on the second amendment to the Gas Sales and Purchase Agreement dated June 1, 1970. The parties to the settlement agreement were Amoco Production Company, McCulloch Oil Corporation, McCulloch Gas Processing Corporation and appellant. The last three are referred to throughout the agreement collectively as "McCulloch."

Although the agreement contains the self-serving clause referred to in the majority opinion to the effect that the purchase of gas was for the benefit of appellant's gas customers, the agreement on its face reflects that the $581,000 was to be paid by all three companies and that the considerations given and received under the agreement were by all three companies. The allocation of $581,000 of the total amount paid by all three companies to the increased cost of some of the gas involved in the settlement is arbitrary.

---

**2.** The record does not reflect whether or not copies of these contracts were filed with the PSC pursuant to § 37–3–111, W.S.1977, which requires filing by public utilities of contracts, agreements or arrangements to which they may be a party. If not filed by appellant, the reason for not doing so could be the fact that it was not a party to them.

At the time the application was filed, the PSC recognized the impropriety of treating the $581,000 in a "pass on" or "pass through" procedure. The application also requested a "pass on" or "pass through" of $134,463 annualized because the Federal Energy Regulatory Commission had authorized one of appellant's suppliers to increase the cost of gas. The initial PSC Notice and Order recognized this request as properly subject to the "pass on" or "pass through" procedure and so treated it. It did not so recognize the $581,000 "pass on" or "pass through" request. The resulting hearing on it should have been a full rate hearing.

Instead, the hearing concerned the issue as to whether the $581,000 was payment for gas already received or whether it was for gas to be received—whether or not the payment was an expense item. These matters can properly be addressed only after a full rate hearing on the basis of the complete information on the appellant's operations. Appellant raises a question concerning denial of its constitutional rights. Without a full rate hearing, the question of confiscatory rates cannot be answered. Even if the $581,000 is determined to be other than an expense item, the change in rates may be necessary to avoid a confiscatory situation. Such cannot be determined without a full rate hearing.

In summary, I believe the $581,000 is reflected to be an arbitrary amount on the face of the settlement agreement and, therefore, is not subject for consideration under the accelerated or automatic "pass on" or "pass through" procedure. The application should have been summarily rejected on this basis; and if appellant desired further consideration, it should have presented evidence customary and usual to a full rate hearing upon which the reasonableness of its proposed rates could be gauged. In any event, for these reasons, appellant cannot complain concerning the denial of its request for a change in rates.