**UNION TELEPHONE COMPANY, INC., Petitioner,**

v.

**The WYOMING PUBLIC SERVICE COMMISSION; John R. Smyth, Bill Tucker, and Nels J. Smith, in their official capacities as Commissioners of the Wyoming Public Service Commission; and Mountain States Telephone and Telegraph Company, d/b/a US West Communications, Respondents.**

No. 91–110.

Supreme Court of Wyoming.

May 15, 1992.

Bruce S. Asay, Cheyenne (argued) and V. Anthony Vehar of Vehar, Beppler, Lavery, Rose and Boal, Evanston, for petitioner.

Joseph B. Meyer, Atty. Gen., Michael L. Hubbard, Sr. Asst. Atty. Gen., and Kristin Lee, Asst. Atty. Gen. (argued), for respondent Public Service Com'n.

Paul J. Hickey (argued), and Richard D. Bush of Hickey & Evans, Cheyenne, and Robert L. Connelly, Jr., Denver, Colo., for respondent US West Communications, Inc.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

CARDINE, Justice.

Union Telephone Company, Inc. (Union Telephone) challenges an order of the Wyoming Public Service Commission (PSC) which set compensation rates for operation of Union's cellular telecommunications service (Union Cellular). Union Telephone complains that the PSC's order does not require access payments to Union Cellular for certain calls terminating on its network through its interconnection with appellee US West Communications (US West). Union Telephone attacks the order for failure to apply the principle of "mutual compensation" to these calls.

We reverse the challenged portion of the PSC's order and remand for further proceedings.

Union Telephone states the issue on appeal as follows:

Issue 1: The decision of the Commission in refusing to recognize the principle of mutual compensation is contrary to law, not supported by substantial evidence, arbitrary and capricious.

Subissue 1(a): The decision of the Commission in rejecting the principle of mutual compensation is not in conformity with the law in that it violated the constitutions of Wyoming and that [of the] United States.

Subissue 1(b): The Commission's rejection of Union's request for mutual compensation is violative of Wyoming Statute.

Subissue 1(c): The decision of the Commission in rejecting the principle of mutual compensation is violative of federal law.

Subissue 1(d): The findings of the Commission in its Order are not supported by substantial evidence.

Subissue 1(e): The decision of the Commission is arbitrary and capricious.

The parties settled a second issue which related to the "calling party pays" principle after appellant's opening brief was filed. Only the issue described above is now before us.

Appellant Union Telephone is an independent telephone company certificated by the PSC to provide exclusive, local exchange telephone service in Eastern Uinta and Southwestern Sweetwater counties. See Union Tel. Co., Inc. v. Wyoming Public Service Comm'n, 821 P.2d 550 (Wyo.1991). Union has recently obtained a license from the Federal Communications Commission (FCC) to operate an exclusive cellular telecommunications service within the area known as "Rural Service Area No. 720 Wyoming 3–Lincoln" (hereafter RSA). The RSA, which is much larger than Union Telephone's certificated local exchange area, includes all of Uinta and Lincoln Counties and parts of Teton, Sublette, Fremont, Sweetwater and Carbon Counties. For purposes of clarity, we shall refer in this opinion to Union Telephone Company, Inc., the company which is the named party in this suit, as "Union Telephone" and to that portion of Union Telephone which operates its cellular service as "Union Cellular."

Appellee US West provides certificated local exchange service in service areas throughout the state of Wyoming. Its wireline service area includes the majority of the more populated areas located outside of Union Telephone's certificated service area but within Union Cellular's RSA. In order to provide its cellular customers with access to customers of US West and other independent telephone companies, Union Cellular sought to interconnect its cellular facilities with US West's landline network. Union Cellular proposed a unique interconnection arrangement which would allow it, by using US West's public-switched network, to avoid constructing many additional facilities to handle the cellular traffic.

US West's traditional arrangement with cellular carriers calls for a "Type 1," "Type 2," or "Type 2A" interconnection. In a Type 1 interconnection, the cellular carrier routes its cellular traffic to a mobile telephone switching office. This office, which operates like a private branch exchange, interconnects directly to the public-switched network through a US West end office switch. The cellular carrier is assigned blocks of telephone numbers which have the characteristics of the US West end office in which they are housed. *See* Appendix 1 to this opinion for a diagram illustrating a typical Type 1 interconnection.

In a Type 2 or 2A interconnection, the cellular carrier's mobile telephone switching office itself takes on the characteristics of an end office switch. The cellular carrier is assigned a unique prefix and trunk groups are established directly to the public-switched network local and toll-access tandems. Auxiliary functions are handled by a separate connection with a US West end office. *See* Appendix 2 to this opinion for a diagram illustrating a typical Type 2A interconnection.

The interconnection Union Telephone requested on behalf of Union Cellular did not correspond exactly with either a Type 1 or a Type 2 interconnection. Instead, Union Telephone's proposed arrangement allowed Union Telephone to itself provide the interconnection between its cellular and landline operations. This arrangement would require the cellular mobile traffic to be blended directly into the public-switched network and routed from there through Union Telephone's existing facilities, rather than being delivered to Union Cellular over a US West trunk group provided for that purpose. Thus, Union Cellular could avoid some of the cost of acquiring extra facilities between its mobile telephone switching office and its cell sites in US West's exchange areas. Union Telephone's proposed arrangement is illustrated in Appendix 3 to this opinion.

US West consented to Union Telephone's proposed interconnection plan. However, the parties could not agree how this arrangement should be priced. On March 27, 1990, Union Telephone wrote US West a letter requesting information relating to the interconnection. When the parties still could not reach agreement, this letter became the basis of a complaint by Union Telephone to the PSC. On July 5, 1990, Union Telephone designated the following issues to be considered at a PSC hearing:

1. How should Union and U.S. West be compensated for wireline traffic originated on U.S. West's wire-line system and terminated on Union's cellular system?

2. How should Union and U.S. West be compensated for cellular traffic originated on Union's cellular system and terminated on U.S. West's wire-line system?

3. Should cellular air time be paid by the originating customer only, by the originating and receiving customers, or by the cellular customer only?

The PSC held hearings on July 11, 1990, and again on August 20, 1990, at which both Union Telephone and US West presented testimony and exhibits on these questions. US West took the position that it was entitled, on local calls within its territory, to originating access charges for a call placed by a US West subscriber to a Union Cellular customer, and to terminating access charges for a call placed from a Union Cellular subscriber to a US West customer. ("Originating access charges" refer to charges paid to a telephone company whose customer initiates a call terminated by another carrier; "terminating access charges" refer to charges paid to a telephone company which completes a call initiated by another carrier's customer.) This plan differed from US West's typical local service arrangement with cellular carriers, in which it charged them only for terminating access. US West considered the additional charge justified because of the unique interconnection agreement it had reached with Union Cellular. The plan was also consistent with US West's interconnection policies in that Union Cellular would not be paid terminating access for local calls made to a cellular customer located outside Union Telephone's wireline service area.

For toll (intrastate, inter-carrier long distance) calls, US West's plan called for payment of terminating access charges to the company completing the call in its wireline service area. Thus, Union Cellular would be responsible for paying US West terminating access payments for toll calls which US West completed, in its territory, from a Union Cellular subscriber. However, US West would only pay Union Cellular for completion of toll calls which terminated in Union Telephone's certificated area. In other words, Union Cellular would receive no terminating access payments when it completed a toll call in areas where it was the cellular carrier but US West was the wireline carrier. A witness for US West stated this price proposal was consistent with its policy of paying compensation to other local exchange carriers but not to any alternate providers, including cellular carriers.

Union Cellular took the position that, as a "co-carrier," it was entitled to "mutual compensation" for terminating any call, local or toll, made by a US West subscriber to a Union Cellular subscriber. Mutual compensation would require that US West and Union Cellular be paid their costs for switching all calls which pass through the interconnection and are terminated either on Union Cellular's grid or on US West's landline network. James Woody, executive vice-president of Union Telephone, explained that Union Cellular has no ability to prevent calls being made to its customers. Under US West's plan, Union would be faced with the costs of transporting calls without compensation. Furthermore, US West's plan is arbitrary because a mobile phone customer may be listed in US West wireline territory, but because he is "mobile," he may actually be located in Union Telephone wireline territory when he receives a call. In that case, Union Cellular would be unable to recognize and request terminating access payments, even though it was entitled to them under the US West plan. The reverse could also occur. Union Cellular further calculated that US West would make a profit on local and toll calls to Union Cellular customers, even if US West paid terminating access in all cases.

On December 18, 1990, the PSC issued its Memorandum Opinion, Findings and Order. It dismissed Union Telephone's complaint and the complaint of an intervenor, Commercial Communications, and authorized US West's compensation plan. Union Telephone filed a petition for review of the PSC's order in the district court on January 17, 1991. The district court entered an order certifying the case directly to our court.

The basis and standard of our review of the PSC's order is defined by W.S. 16-3-114(c) (July 1990 Repl.):

To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Our review is also undergirded by the statutory provision that the PSC must set rates which are "just and reasonable." W.S. 37-3-101 (1991 Cum.Supp.).

Union Telephone mounts a multi-faceted challenge to the PSC's approval of US West's rate proposal and to its denial of

mutual compensation to Union Cellular. We reverse on the grounds that the PSC's decision was arbitrary and capricious and lacking in substantial evidence on the question of mutual compensation. We need not consider Union Telephone's other arguments.

In a recent case involving a PSC decision, we expressed our standard of review for challenges based on lack of substantial evidence and arbitrary and capricious action:

When a case is certified to this court pursuant to Rule 12.09, W.R.A.P., we examine the decision of the administrative agency as if we were the reviewing court of the first instance. *Vandehei Developers v. Public Service Commission,* 790 P.2d 1282 (Wyo.1990); *Exxon Corporation v. Wyoming State Board of Equalization,* 783 P.2d 685 (Wyo. 1989), *cert. denied* 495 U.S. 910, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).

\*    \*    \*    \*    \*    \*

\* \* \* In reaching a determination with respect to whether the factual decision of an administrative agency is arbitrary and capricious, our standard is that we review the entire record and determine whether the decision can be supported by evidence found in that record. *Palmer v. Board of Trustees of Crook County School District No. 1,* 785 P.2d 1160 (Wyo.1990). \* \* \*

"Petitioners have the burden of proving that the PSC's actions were arbitrary, capricious or an abuse of discretion. *Wyoming Bancorporation v. Bonham,* 527 P.2d 432, 439 (Wyo.1974), *op. supp.,* 563 P.2d 1382 (Wyo.1977), *reh'g denied,* 566 P.2d 219 (Wyo.1977). The reviewing court must examine whether the decision made by an administrative agency has been reached on relevant factors and was rational. *Tri–State Generation and Transmission Association, Inc. v. Environmental Quality Council,* 590 P.2d 1324, 1331 (Wyo.1979). Agency decisions are to be reversed only for errors of law. *Shenefield v. Sheridan County School District No. 1,* 544 P.2d 870, 874 (Wyo.1976). Further, courts will not substitute their judgment

for that of an administrative agency. *Gilmore v. Oil and Gas Conservation Commission,* 642 P.2d 773 (Wyo.1982)." *Vandehei,* 790 P.2d at 1284.

\*    \*    \*    \*    \*    \*

\* \* \* In reaching the determination as to whether the record encompasses substantial evidence to support the agency decision, we also review the entire record presented before the agency. *Matter of Warehime,* 806 P.2d 292 (Wyo.1991); *Tri–State Generation and Transmission Association, Inc. v. Wyoming Public Service Commission,* 784 P.2d 627 (Wyo.1989); *Western Radio Communications, Inc. v. Two–Way Radio Service,* 718 P.2d 15 (Wyo.1986). In this court, the burden of establishing the absence of substantial evidence is assigned to the party challenging the sufficiency of the evidence. *Palmer; Western Radio.* Substantial evidence is relevant evidence, which reasonable minds would accept as adequate to support the findings of the agency. *Palmer; McCullouch Gas Transmission Company v. Public Service Commission of Wyoming,* 627 P.2d 173 (Wyo.1981). The administrative agency is vested with the authority to weigh and determine the credibility of evidence based upon its expertise and experience. *Palmer; Western Radio; Matter of Rule Radiophone Service, Inc.,* 621 P.2d 241 (Wyo.1980). We do not substitute our judgment for that of the PSC if the agency decision is supported by substantial evidence. *Mountain States Telephone and Telegraph Company v. Public Service Commission of Wyoming,* 698 P.2d 627 (Wyo. 1985).

*Union Tel. Co., Inc. v. Wyoming PSC,* 821 P.2d 550, 556–57 (Wyo.1991).

*Interconnection Alternatives and Mutual Compensation*

■ The PSC refused Union Cellular mutual compensation in part because it found that Union Cellular's proposed interconnection did not fall into the traditional categories of Type 1, Type 2, or Type 2(A) interconnections. The type of interconnection is

significant because of a FCC decision concerning interconnection arrangements with cellular carriers. This decision, a copy of which was presented to the Commission and is contained in the record on appeal, conditions mutual compensation on the type of interconnection made. Its pertinent language reads as follows:

█ Under Type 1 interconnection, the telephone company owns the switch serving the cellular network. Therefore, it performs the origination and termination of both incoming and outgoing calls. Under Type 2, by contrast, the cellular carrier owns the switch, enabling it to originate outgoing calls and terminate incoming calls. Hence, the Type 2 carrier incurs the switching costs for these origination and termination functions.

47. Based on the above, *we believe the principle of mutual switching compensation should apply to Type 2 but not Type 1 service.* Cellular carriers and telephone companies are equally entitled to just and reasonable compensation for their provision of access, whether through tariff or by a division of revenues agreement. We further find that telephone company switching charges which fail to distinguish between Type 1 and Type 2 carriers may be unjustly discriminatory * * *, depending on the facts of the given case.

*In the Matter of The Need to Promote Competition and Efficient Use of Spectrum for Radio Common Carrier Services,* Decl. Rul. 87–163, 2 FCC Rcd. 2910, 2915 (May 18, 1987) (footnote omitted), (hereafter *Efficient Use of Radio Spectrum Order*).

█ As US West points out, this FCC decision is not binding on the PSC. The FCC only has jurisdiction over interstate interconnection charges, and its ruling was not designed to establish a mandatory cost arrangement for intrastate proceedings. However, the FCC scheme is powerful, persuasive authority for the concept that the party which switches a call, be it a cellular or landline carrier, should be compensated for the switching expenses it incurs. The FCC distinguishes a Type 2 interconnection

from a Type 1 precisely because in a Type 2 interconnection the cellular carrier incurs these switching costs.

Furthermore, the PSC adopts the FCC's Type 1/Type 2 methodology in its order. The Commission made a finding that the FCC ruling did not apply *to this case* because Union Cellular's interconnection was neither Type 1 nor Type 2. Paragraph 7 of the PSC's Conclusions of Law reads as follows:

7. Union Cellular's interconnection request is unprecedented and does not fit the Type 1 and Type 2 or 2A interconnections as defined and discussed in the FCC orders which evaluated and were based upon nationwide industry operational practices and standards. The Commission concludes that, as the Union Cellular operation will utilize about 700 miles of US West facilities between Jackson and its Mountain View tandem, the subject interconnection cannot be considered a Type 2A connection as requested by Union Telephone. Union Cellular's operation must be evaluated on its specific characteristics and determinations made based upon its special operating needs. In such cases, the paramount consideration is not the desires of the utility or utilities involved, but the public interest.

This flat denial of treatment as a Type 2 interconnection is not supported by the evidence before the Commission. As noted above, whether the carrier *controls the interconnecting switch and thus incurs switching costs* is the decisive factor in determining its Type 1 or Type 2 status. Union Telephone presented testimony that Union Cellular's proposed interconnection requires Union Cellular to switch the calls. James Woody, a witness for Union Telephone, testified as follows:

Q. Is it your testimony that the Union interconnection arrangement is, in fact, a Type 2 as the industry knows that interconnection arrangement?

A. Yes, it is, in fact, a Type 2. It connects directly with our tandem switch as opposed to a US West tandem switch, and a Type 2 interconnection exists be-

tween Union Telephone Company's exchange carrier tandem and Union's cellular switch.

Q. So both your lawyer and I were incorrect when we characterized this as a unique interconnection arrangement during our opening statements.

A. Well, it's unique in that we're utilizing the existing toll facilities to handle the service. And it's unique because Union's cellular area is so much larger than the MSAs that are currently in service.

Kathy Stephens, a strategic pricing director for US West, also testified as follows:

Q. How are you pricing this one, Union service, as a Type 2A?

A. No. Union's service, the proposal that we have is what I've outlined in our testimony. *While they do have a Type 2 interconnection,* the Type 2 is off of Union's switch not US West. So it's not a US West Type 2 interconnection as we typically know it. * * *

Q. Does that fall into either of these categories, or is it totally different?

A. It's unique. *It's closer to a Type 2.* [emphasis added]

This testimony revealed that, although there were some differences between it and a standard Type 2 interconnection, the interconnection agreement had Type 2 characteristics. The chief difference concerning the interconnection itself was that it interconnected off Union's switch rather than US West's switch. However, there was no testimony that this difference decreased or eliminated Union's switching costs associated with a regular Type 2 switch. Thus, the rationale for Type 2 status continued to be present.

The Commission's stated reason for refusing to view Union's interconnection as Type 2 was that US West would incur increased and unprecedented costs under the interconnection arrangement in routing Union's local cellular calls over its network. There was no showing, however, that US West would not receive compensation through its tariffed access charges for these extra costs in transporting local calls. These costs were built into US West's in-

terconnection proposal as presented to the PSC. For example, one of US West's calling scenarios showed that a one-minute call from a Jackson landline customer to a Jackson Union Cellular customer would produce over 16 cents of billable interconnection charges payable to US West under its plan. Four cents of these access charges would be for transportation from Jackson to Cheyenne and five cents from Cheyenne to Mountain View. Thus, US West would be compensated for the additional transportation required because of the unique interconnection.

There is additional evidence in the record that US West planned to recoup some of the extra charges due to the interconnection through higher access charges to Union Cellular. William Burke testified at the second hearing that US West charges other cellular carriers 11 cents per minute for access and Union Cellular 16 cents per minute, precisely because of the difference in the interconnection arrangement. The PSC's order does not explain what, if any, effect this differential had on its decision.

Since the PSC approved US West's rates, which factor in the costs of utilization of US West's lines, it cannot reasonably adhere to its stated reason for denying Type 2 status to Union Cellular. Nevertheless, the Commission, in approving US West's plan, both approved the compensatory rates and refused mutual compensation to Union Cellular. This results in giving US West the benefits of the interconnection through compensatory rates for local landline to cellular traffic, while denying Union Cellular access charges for completing the calls.

In short, the reasons given for refusing to recognize Type 2 status do not support the decision made. The PSC's decision on this point is arbitrary and capricious and is not supported by substantial evidence.

*Disparate Call Treatment under the US West Plan*

■ Another of the Commission's stated reasons for denying mutual compensation was that Union Cellular's use of US West's

facilities should not burden US West's local customers. The Commission explained this concern as follows:

> The Commission, under the just and reasonable requirements of the law and the "used and useful" ratemaking provision of W.S. 37–2–119, has uniformly required that a local exchange company must provide approved separate accounting for radio common carrier services and other special optional utility or non-utility services so that the Commission can determine in a rate proceeding that the local exchange company's subscribers are in no way burdened by those activities. This requirement has been applied to Union Telephone's cellular operations, and the just and non-discriminatory requirements of the Wyoming utility statutes require that this public interest requirement apply in this case so that Union Cellular's utilization of the facilities of US West will not place additional burdens or costs on US West subscribers' service[.]

The PSC's reasoning here involves a large leap of logic which we are unwilling to take. The Commission's order notes its previous direction to Union Telephone that its subscribers should not be burdened by Union Cellular's costs. In other words, a local exchange carrier which also engages in cellular service must not use its telephone service to subsidize the cellular service. We do not quarrel with this determination. However, from there, the PSC concludes that this same sort of subsidy will occur if the rates for calls to Union Cellular customers from US West subscribers are increased to reflect the actual cost of the call. The analogy does not hold because, under Union's plan, basic phone rates to US West subscribers would not be increased. The only rates which would be established at a higher rate than that now tariffed are those for specific calls to Union Cellular customers. The US West subscriber would be responsible for increased rates only for those calls he or she made to Union Cellular customers. It is erroneous to characterize this as a "subsidy" or a "burden" on US West subscribers, who are free to place these calls or not. It is cer-

tainly not the kind of subsidy the PSC sought to avoid in its earlier direction to Union Cellular. Accordingly, the PSC's determination that paying Union Cellular mutual compensation would somehow burden US West subscribers was erroneous.

*Disparate Treatment of Cellular Carriers*

■ The PSC's primary reason for denying Union Cellular mutual compensation was that Union Cellular's operations were not equivalent to those of a local exchange carrier.

> The Commission further concludes, in concert with the FCC decisions, that the relevant and material evidence of record supports that Union Cellular's cellular operations cannot be equated to that of local exchange carriers, or interexchange carriers for pricing purposes. Cellular services do not have the local exchange company responsibilities of a universal service carrier of last resort. This Commission concludes that cellular services, including those of Union Telephone, are discretionary or optional services, and as such should pay their own way and not burden local services.

The *Efficient Use of Radio Spectrum Order*, mentioned above, did not require that cellular carriers be paid access in the same fashion as wireline local exchange carriers (LECs) for purpose of intrastate communications. The FCC only required mutual compensation for cases of Type 2, interstate compensation. Its earlier ruling in *Indianapolis Tel. Co. v. Indiana Bell Tel. Co., Inc.*, 1 F.C.C.Rcd. 228 (October 16, 1986), mentioned in the *Efficient Use of Radio Spectrum Order*, held that intrastate financial arrangements for interconnection had only to be reasonable and that cellular companies did not have to be treated like LECs. The reasons for this were summarized by one of the litigants in the *Order* as follows:

> [C]ellular carriers generally do not obtain state certification as franchised telephone companies, are not operating under the jurisdiction of the state commissions, do not accept the responsibilities of

a franchised telephone company as a provider of last resort, and do not participate in the intrastate cost and revenue pools.

*Efficient Use of Radio Spectrum Order,* at 2915.

Other states' utility commissions have also generally denied mutual compensation to cellular carriers for intrastate interconnection. Typical of their rationale is *Re Indianapolis Tel. Co.,* 104 P.U.R. 4th 99, 117–18 (Ind.Util.Reg.Comm'n 1989):

In considering how compensation should flow as between the interconnecting entities, we must evaluate the relative benefits to each. The evidence clearly demonstrates that the vast majority of the benefits of interconnection enure to the cellular provider. It is clear that the landline telephone company may exist and viably render service to its customers without the interconnection to the cellular provider as Indiana Bell long has. However, ITC's own evidence indicates that it may not realistically render service absent its interconnection with Indiana Bell. Given the dramatic disparity in the number of customers receiving service through ITC's system and those receiving service from Indiana Bell, the marginal benefits to Indiana Bell's customers resulting from Indiana Bell's interconnection with ITC are de minimus. Given the substantially one way flow of benefits to the cellular provider, ITC's proposal to pay certain trunking costs and then be compensated for the interconnection to Indiana Bell although explicable, is inequitable. The Commission finds that ITC should compensate Indiana Bell for interconnection. Indiana Bell should not be required to compensate ITC for interconnection to Indiana Bell.

*See also e.g. CyberTel Cellular Tel. Co. v. Southwestern Bell Tel. Co.,* 94 P.U.R. 4th 120 (Mo.Pub.Serv.Comm'n 1988).

We disagree with the position taken by the FCC in the *Indianapolis* case and by those state utility commissions mentioned above. First, we see no logical reason for distinguishing between *interstate* interconnection arrangements, for which mutual compensation must be paid, and *intrastate* arrangements, for which it need not be (other than the fact that the FCC has jurisdiction over the former and not over the latter). The policy of paying a carrier its switching costs is the same in both circumstances, and a carrier is equally entitled to be paid for the services it provides.

Second, the benefit of interconnection does not accrue disproportionately to the cellular customer *when he receives a call placed by a US West subscriber.* This is exactly the type of call for which Union Cellular will not be paid terminating access under the US West plan adopted by the PSC. It is the US West customer who chooses to make this type of call and who thus receives much more than a *de minimus* benefit. In fact, the US West customer benefits at least as much as the Union Cellular customer from the ability to complete the call. The PSC's order ignores this benefit, which leads to its erroneous conclusion.

Finally, the public interest favors payment of access charges to Union Cellular. The primary concern of the PSC, and thus also of this court on review, is to see that the public interest is met. *Mountain States Tel. and Tel. Co. v. Public Service Comm'n,* 698 P.2d 627, 631 (Wyo.1985); *Mountain Fuel Supply Co. v. Public Service Comm'n,* 662 P.2d 878, 883 (Wyo. 1983). Although Union Cellular is not a "provider of last resort" or a "local exchange carrier," it is certificated to provide cellular service to the public within its service area. To make such service worthwhile and affordable to the public, interconnection with US West's landline network is desirable if not crucial. A necessary corollary to interconnection is payment of its costs to the utility which incurs them. The PSC's determination that payment of mutual compensation to Union Cellular will "burden" US West customers is not supported by the record and should not preclude a reasonable surcharge to cover the cost of the call payable by a US West subscriber for calls terminated on Union Cellular's network.

*Conclusion*

The PSC's determination that Union Cellular is not entitled to mutual compensation for its interconnection with US West is arbitrary and capricious and is not supported by substantial evidence in the record. The PSC's determination leads to an unjust and unreasonable result: Union Cellular will not be paid for terminating calls which it switches. Accordingly, that portion of the PSC's order which denies mutual compensation to Union Cellular is reversed, and this case is remanded for further proceedings consistent with this opinion.

APPENDIX 1

TYPE 1 INTERCONNECTION
–GENERAL

APPENDIX 2

TYPE 2A INTERCONNECTION

APPENDIX 3

PROPOSED INTERCONNECTION WITH UNION